## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| JOSEPH CECIL, Derivatively on Behalf of SHOALS TECHNOLOGIES GROUP, INC., <br><br> Plaintiff, <br><br> DOMINIC BARDOS, TY DAUL, BRAD FORTH, PHILIP GARTON, KEVIN HUBBARD, PETER JONNA, ROBERT JULIAN, JEANNETTE MILLS, BRANDON MOSS, DEAN SOLON, LORI SUNDBERG, JEFFREY TOLNAR, TONI VOLPE, JASON WHITAKER, and PETER WILVER, <br><br> Defendants, <br><br> and <br><br> SHOALS TECHNOLOGIES GROUP, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **JURY TRIAL DEMANDED** |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Joseph Cecil ("Plaintiff"), by and through Plaintiff's undersigned counsel, derivatively on behalf of Nominal Defendant Shoals Technologies Group, Inc. ("Shoals" or the "Company"), brings this Verified Shareholder Derivative Complaint against Dominic Bardos ("Bardos"), Ty Daul ("Daul"), Brad Forth ("Forth"), Philip Garton ("Garton"), Kevin Hubbard ("Hubbard"), Peter Jonna ("Jonna"), Robert Julian ("Julian"), Jeannette Mills ("Mills"), Brandon Moss ("Moss"), Dean Solon ("Solon"), Lori Sundberg ("Sundberg"), Jeffrey Tolnar ("Tolnar"), Toni Volpe ("Volpe"), Jason Whitaker ("Whitaker"), and Peter Wilver ("Wilver") (collectively,

1

the "Individual Defendants" and, together with Shoals, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by Shoals with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought against certain current and former Shoals officers and members of the Company's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants between January 27, 2021 and November 12, 2024, inclusive (the "Relevant Period").

2. Shoals is a provider of electrical balance of system ("EBOS") products for solar power generation, battery storage, and electric vehicle charging infrastructure. The Company designs, manufactures, and sells systems for two types of wiring architectures used by the U.S. solar industry: Homerun EBOS; and combine-as-you-go EBOS. In 2021 and 2022, Shoals derived 74% and 77.8% of its revenues, respectively, from the sales of these systems. By 2023, those products provided 81.5% of Shoals' revenues.

3. A critical part of these EBOS systems is a custom wire harness that is used to aggregate electricity from multiple solar panels and deliver that electricity to inverters, allowing the current to be delivered to a power grid of an energy storage product. The wires in these harnesses act as conductors, intended to carry high-voltage electricity. Shoals used polymer-

2

insulated copper wires, purchased from several different suppliers, in manufacturing its EBOS products. Shoals represents that its proprietary wire system requires fewer wires and wire connections than other products, eliminating the need for other materials used in homerun wiring architecture and lowering labor and material costs. Shoals also claims that its proprietary solutions have greater reliability and lower maintenance costs than conventional EBOS systems.

4. The Company offers an assurance type warranty to its customers that purportedly protects against manufacturer defects and accounts for warranty liabilities by recording a reserve provision for estimated future costs related to warranty remediation expenses. Since the Company's IPO, Shoals recorded only modest amounts in warranty-related reserves.

5. Throughout the Relevant Period, Shoals emphasized the supposed "safety" and "reliability" of the Company's products through press releases, conference call statements, and other public filings. The Company repeatedly asserted that Shoals had "invested millions of dollars" over the "last 27 years" to develop its EBOS solutions that "significantly increased installation efficiency and safety" and "improv[ed] system performance and reliability for the utility scale solar" market. The Company further represented that its mission was to provide products that enhance "system performance, safety, and reliability." Shoals's website touted that it "focus[ed] on [the] [q]uality and [r]eliability" of its EBOS components and expressed that "Shoals products are built in a factory controlled environment with calibrated machines and rigorous quality standards. Every component is fully tested using our in-house testing chambers to ensure that our EBOS solutions deliver the highest levels of quality and reliability."

6. Despite its focus on assuring investors and customers of its products' reliability and safety, by at least March 2022, Shoals had received a report from a customer indicating that there were exposed copper conductors on wire harnesses installed at the customer's solar field.

Throughout 2022, numerous other customers reported similar instances of exposed copper conductors in solar fields. In total, Shoals installed EBOS systems with defective wire harnesses at approximately 300 solar fields, representing approximately 30% of all wire harnesses installed by Shoals between 2020 and 2022.

7. Despite this, throughout the Relevant Period, the Individual Defendants made and/or caused the Company to make materially false and misleading statements and omissions of material fact regarding its business, operations, and prospects.

8. In light of the Individual Defendants' misconduct, the Company as well as certain of the Individual Defendants were named as defendants in a federal securities fraud class action lawsuit originally filed in the United States District Court for the Middle District of Tennessee, captioned *In re Shoals Technologies Group, Inc. Securities Litigation*, Case No. 3:24-cv-00334-WDC-AN (M.D. Tenn.) (the "Securities Class Action"). The Securities Class Action has further subjected Shoals to the need to undertake internal investigations and the need to implement adequate internal controls, as well as exposed the Company to massive class-wide liability.

9. On March 18, 2026, Plaintiff, through Plaintiff's counsel, served a demand on Shoals' Board to investigate the violations of law described herein and to pursue remedies through litigation against the Individual Defendants for breaching their fiduciary duties by allowing Shoals to issue improper statements set forth herein (the "Demand"). The Demand is attached hereto as Exhibit A. On March 25, 2026, counsel for Shoals acknowledged receipt of the Demand and stated that the Board would consider the Demand and respond in due course. The March 25, 2026 letter is attached hereto as Exhibit B.

10. On May 15, 2026, counsel for Shoals sent a further letter (the "Demand Refusal Letter") on behalf of the Board. The Demand Refusal Letter confirmed that the Board had

convened at its regularly scheduled April 30, 2026 meeting and "discussed the Demand," but stated that the Board had "determined to defer a final decision on the Demand at this time." The Board did not state that it had formed an independent committee, retained independent counsel to conduct a merits investigation, reviewed relevant documents, interviewed witnesses, evaluated claims against the Individual Defendants, or otherwise made a good-faith merits determination concerning whether pursuing the claims would be in Shoals' best interests. The Board also expressly declined to cause Shoals to enter into any tolling agreements, thereby refusing to preserve the Company's claims while it deferred any decision. The Demand Refusal Letter is attached hereto as Exhibit C.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §78n(a)) and SEC Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Shoals' principal executive offices are located in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Individual Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

**PARTIES**

16. **Plaintiff Joseph Cecil** is a current shareholder of Shoals and has continuously held Shoals common stock at all relevant times.

17. **Nominal Defendant Shoals** is incorporated under the laws of Delaware, and its principal executive offices are located at 1500 Shoals Way, Portland, Tennessee. The Company's common stock trades on the Nasdaq under the symbol "SHLS."

18. **Defendant Bardos** has served as the Company's Chief Financial Officer ("CFO") since October, 2022. According to the Company's 2026 Proxy Statement, in 2025, Defendant Bardos received $2,205,891 in total compensation from the Company. As of March 10, 2026, Defendant Bardos beneficially owned 113,434 shares of Shoals common stock.

19. **Defendant Daul** has served as a Company director since March 2021. Defendant Daul also served as a member of the Company's Audit Committee during the Relevant Period and continues to serve on the Audit Committee. According to the Company's 2026 Proxy Statement, in 2025, Defendant Daul received $255,002 in total compensation from the Company. As of March 10, 2026, Defendant Daul beneficially owned 105,281 shares of Shoals common stock.

20. **Defendant Forth** has served as a Company director since June 2017 and currently serves as Chairman of the Board. According to the Company's 2026 Proxy Statement, in 2025,

6

Defendant Forth received $370,002 in total compensation from the Company. As of March 10, 2026, Defendant Forth beneficially owned 563,990 shares of Shoals common stock.

21. **Defendant Garton** served as the Company's Chief Financial Officer from December, 2017 until May, 2022. According to Shoals' 2022 Proxy Statement, Defendant Garton was responsible for the Company's financial reporting and accounting functions, and received $523,593 in total compensation from the Company. During the Relevant Period, Defendant Garton sold approximately 204,000 shares of Shoals stock based on material non-public information, receiving total proceeds of over $4.8 million.

22. **Defendant Hubbard** served as interim CFO for the Company from May, 2022 to October 2022 and had previously served as outside financial reporting consult for the Company. By virtue of his position with the Company, Defendant Hubbard owed the Company and its shareholders fiduciary duties of loyalty, good faith, candor, and due care. For the 2022 fiscal year, he received $492,950 in total compensation from the Company.

23. **Defendant Jonna** previously served as a Company director and resigned from the Board effective August 15, 2022. According to the Company's 2023 Proxy Statement, in 2022, Defendant Jonna received approximately $209,822 in total compensation from the Company.

24. **Defendant Julian** has served as a Company director since August 2022. Defendant Julian served as Chair of the Company's Audit Committee during the Relevant Period and continues to serve as Chair of the Audit Committee, where he is designated as an "audit committee financial expert." According to the Company's 2026 Proxy Statement, in 2025, Defendant Julian received $280,002 in total compensation from the Company. As of March 10, 2026, Defendant Julian beneficially owned 81,425 shares of Shoals common stock.

7

25. **Defendant Mills** has served as a Company director since August 2022. Defendant Mills served on the Company's Compensation Committee during the Relevant Period and currently serves on the Company's Nominating and Corporate Governance Committee. According to the Company's 2026 Proxy Statement, in 2025, Defendant Mills received $255,002 in total compensation from the Company. As of March 10, 2026, Defendant Mills beneficially owned 81,425 shares of Shoals common stock.

26. **Defendant Moss** has served as the Company's Chief Executive Officer ("CEO") since July 2023 and has served as a Company director since February 2024. According to the Company's 2026 Proxy Statement, in 2025, Defendant Moss received $5,961,218 in total compensation from the Company. As of March 10, 2026, Defendant Moss beneficially owned 93,807 shares of Shoals common stock.

27. **Defendant Solon** founded Shoals in 1996 and previously served as a Company director until his resignation from the Board effective February 21, 2022. During the Relevant Period, Defendant Solon sold over 52.4 million shares of Shoals stock based on material non-public information, with gross proceeds valued at more than $1.19 billion.

28. **Defendant Sundberg** has served as a Company director since March 2021. Defendant Sundberg served as Chair of the Company's Compensation Committee during the Relevant Period and continues to serve as Chair of the Compensation Committee. Defendant Sundberg also serves on the Company's Nominating and Corporate Governance Committee. According to the Company's 2026 Proxy Statement, in 2025, Defendant Sundberg received $270,002 in total compensation from the Company. As of March 10, 2026, Defendant Sundberg beneficially owned 99,781 shares of Shoals common stock.

29.     **Defendant Tolnar** has served as the Company's President since December 2022 and previously served as the Company's Interim Chief Executive Officer from March 2023 through July 2023. According to the Company's 2026 Proxy Statement, in 2025, Defendant Tolnar received $1,916,520 in total compensation from the Company. As of March 10, 2026, Defendant Tolnar beneficially owned 54,854 shares of Shoals common stock.

30.     **Defendant Volpe** has served as a Company director since March 2021. Defendant Volpe also served as a member of the Company's Audit Committee during the Relevant Period and continues to serve on the Audit Committee. According to the Company's 2026 Proxy Statement, in 2025, Defendant Volpe received $255,002 in total compensation from the Company. As of March 10, 2026, Defendant Volpe beneficially owned 99,781 shares of Shoals common stock.

31.     **Defendant Whitaker** served as the Company's Chief Executive Officer from January, 2020 until March, 2023 and had previously served as the Company's President and Chief Technology Officer. According to the Company's 2024 Proxy Statement, in 2023, Defendant Whitaker received $4,477,834 in total compensation from the Company. During the Relevant Period, Defendant Whitaker sold over 565,000 shares of Shoals stock based on material non-public information, with gross proceeds of over $14 million.

32.     **Defendant Wilver** previously served as a Company director from January, 2021 until his August, 2024 resignation. During the Relevant Period, he served as Chair and as member of the Audit Committee, and as member of the Nominating and Corporate Governance Committee. During the 2023 fiscal year, Wilver received $225,849 in total compensation from the Company.

## CORPORATE GOVERNANCE

### Fiduciary Duties of the Individual Defendants

9

33. By reason of their positions as officers, directors, and/or fiduciaries of Shoals and because of their ability to control the business and corporate affairs of Shoals, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

34. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

35. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

36. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and

10

controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

37.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith,

11

and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

**Corporate Governance Guidelines**

38. Shoals also maintains Corporate Governance Guidelines (the "Governance Guidelines") that establish the Board's oversight responsibilities concerning the Company's business operations, risk management systems, financial reporting, legal compliance, and corporate governance practices. The Governance Guidelines expressly state that they were adopted "as a general framework to assist the Board in carrying out its responsibility for the business and affairs of the Company to be managed by or under the direction of the Board."

39. The Governance Guidelines further provide that "[t]he Board's principal responsibility is one of oversight." The Governance Guidelines specifically state that management was responsible for "identifying and managing risk," "preparing the Company's financial statements and determining that they are complete, accurate, and in accordance with generally accepted accounting principles," "establishing satisfactory disclosure controls and internal control over financial reporting," and "timely reporting to the Board."

40. In a section titled "Board Duties and Responsibilities," the Governance Guidelines provide, in relevant part, that Shoals directors are "expected to discharge his or her director duties, including duties as a member of a committee on which the director serves, in good faith and in a manner the director reasonably believes to be in the best interests of the Company." Under the Governance Guidelines, the authority and responsibilities of the Board include:

12

1. <u>Strategic Plan:</u> To set the direction of the Company and monitor management to ensure that the Company achieves its objectives; to review, monitor and approve the overall operating, financial and strategic plans, operating goals, and performance of the Company

2. <u>Reporting and Compliance Systems:</u> To ensure that Company management maintains an effective system for timely reporting to the Board or appropriate Board committees and to the public as required on the following: (1) the Company's financial and business plans, strategies, and objectives; (2) the financial results and condition of the Company and its business segments; (3) significant accounting, regulatory, competitive, litigation, and other external issues affecting the Company; and (4) systems of control which promote accurate and timely reporting of financial information to shareholders and compliance with laws and corporate policies.

3. <u>Risk Oversight:</u> To understand the principal risks associated with the Company's business on an ongoing basis, and oversee the key risk decisions of management, which includes comprehending the appropriate balance between risks and rewards.

4. <u>Disclose Relationships:</u> To disclose promptly to the Board any existing or proposed relationships with the Company (other than service as a Board member or on Board committees) which could be required to be disclosed or could affect the independence of the director under applicable listing standards, including direct relationships between the Company and the director and his or her family members, and indirect relationships between the Company and any business, nonprofit or other organization in which the director is a general partner or manager, officer, or significant shareholder, or is materially financially interested.

5. <u>Shareholder Engagement:</u> To ensure that the Company maintains an active dialogue with shareholders so that their perspectives are thoughtfully considered; and to review shareholder proposals properly submitted and, based on the recommendations of the Nominating and Corporate Governance Committee, respond as appropriate.

6. <u>Annual Shareholders Meeting:</u> To attend the Company's annual shareholders meeting unless unusual circumstances make attendance impractical.

7. <u>Corporate Culture:</u> To devise and maintain a human capital management system and a corporate culture that promote compliance with legal and regulatory requirements and the ethical conduct of the Company's business.

8. <u>Sustainability:</u> To promote the long-term sustainable growth of the Company, including considering the sustainability goals of the Company.

13

9. Compensation: To select, evaluate, and compensate the Company's CEO and to approve the compensation of directors, based on the recommendations of the Compensation Committee.

10. Management Succession Planning: To approve, based on the recommendations of the Nominating and Corporate Governance Committee, an Officer succession plan.

11. Board Evaluation: To review the results of the annual board evaluation conducted by the Nominating and Corporate Governance Committee to determine whether the Board and its committees are functioning effectively.

12. Corporate Governance Documents: To review and approve any amendments to the Company's certificate of incorporation, bylaws, code of ethics, these corporate governance guidelines, and other corporate governance policies, based on the recommendations of the Nominating and Corporate Governance Committee.

41. Consistent with these obligations, Shoals repeatedly represented in its proxy statements during the Relevant Period that the Board actively oversaw the Company's major operational, financial, legal, and compliance risks and maintained systems designed to ensure the integrity of the Company's financial reporting and public disclosures.

**Code of Ethics**

42. Shoals also maintained a Code of Ethics (the "Code") applicable to all directors, officers, and employees of the Company. The Code states that it was designed to "prevent wrongdoing and promote honest, compliant, and ethical conduct in our operations."

43. The Code further states that Shoals' operations were guided by principles including: "Responsibility – We integrate quality and safety into everything"; "Integrity – We do the right thing, in the right way, for the right reason"; and "Accountability – We win for our customers, shareholders, and each other."

44. In a section titled "Fair Dealing," the Code provides that "[n]o director, officer, or employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of facts, or any other unfair practice."

14

45.    In a section titled "Disclosure," the Code further provides:

Shoals' periodic reports and other documents filed with the Securities and Exchange Commission ("SEC"), including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules.

Each director, officer, and employee who contributes in any way to the preparation or verification of Shoals' financial statements and other financial information must ensure that the company's books, records, and accounts are accurately maintained. Each director, officer, and employee must cooperate fully with Shoals' accounting and internal audit functions, as well as Shoals' independent public accountants and counsel.

Each director, officer, and employee who is involved in the disclosure process must:

1. Be familiar with and comply with Shoals' disclosure controls and procedures and its internal control over financial reporting; and

2. Take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of Shoals provide full, fair, accurate, timely, and understandable disclosure.

46.    The Code additionally required that possible violations of the Code be reported to the Audit Committee and further provided that the Audit Committee would investigate reports alleging misconduct by directors or executive officers.

**Audit Committee Charter**

47.    Shoals also maintained an Audit Committee Charter (the "Audit Charter") that imposed extensive oversight obligations on the Audit Committee concerning the Company's financial reporting, disclosure controls, internal controls, legal compliance, and enterprise risk management.

48.    In a section titled "Purpose," the Audit Charter states:

The purpose of the Audit Committee of the board of directors (the "Board") of Shoals Technologies Group, Inc. (the "Company") is to oversee the Company's accounting and financial reporting processes and the audits of the Company's financial statements.

15

In fulfilling its purpose, the Audit Committee is responsible for maintaining free and open communication between itself and the independent auditor, internal audit function, and management of the Company, and for determining that all parties are aware of their responsibilities.

The Audit Committee's principal responsibility is one of oversight. Management of the Company is responsible for preparing the Company's financial statements and determining that they are complete, accurate, and in accordance with generally accepted accounting principles, and establishing satisfactory disclosure controls and internal control over financial reporting. The independent auditor is responsible for auditing the Company's financial statements and the effectiveness of the Company's internal control over financial reporting. The Company's internal and outside counsel are responsible for assuring compliance with laws and regulations and the Company's corporate governance policies.

49. In a section titled "Duties and Responsibilities," the Audit Charter required the Audit Committee, among other things:

a. To review and discuss with the Company's independent auditor "any significant risks identified during the independent auditor's risk assessment procedures";

b. To review and discuss "any audit problems or difficulties," "any significant disagreements with management," and management's responses thereto;

c. To review "the adequacy and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures," including "any significant deficiencies, material weaknesses, or other major issues in the design or operation of" those controls;

d. To review "any fraud involving management or other employees with a significant role in such internal controls";

e. To review and discuss with management "the risks faced by the Company," including "the Company's major financial risk exposures";

f. To review and discuss the Company's annual and quarterly financial statements and the disclosures contained in "Management's Discussion and Analysis of Financial

16

Condition and Results of Operations" before the filing of the Company's Forms 10-K and 10-Q;

g. To review and discuss the Company's earnings releases, earnings guidance, and other financial information disclosed to analysts and investors;

h. To review "major issues regarding accounting principles and financial statement presentations," including "significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements";

i. To monitor compliance with the Company's Code of Ethics and investigate alleged violations thereof;

j. To review "legal and regulatory matters relating to the Company and its subsidiaries that could have a significant impact on the Company's financial statements"; and

k. To establish and oversee procedures for complaints regarding "accounting, internal accounting controls or auditing matters" and the confidential submission of concerns regarding questionable accounting or auditing matters.

50. During the Relevant Period, Defendants Julian, Daul, and Volpe served on the Audit Committee and were therefore charged with carrying out the foregoing responsibilities and ensuring that Shoals maintained adequate systems concerning risk oversight, disclosure controls, financial reporting, and legal compliance.

**The Nominating and Corporate Governance Committee Charter**

51. Shoals also maintained a Nominating and Corporate Governance Committee Charter (the "NCG Charter") establishing the responsibilities of the Nominating and Corporate Governance Committee concerning the Company's governance policies, governance disclosures, shareholder engagement, and Board oversight framework.

17

52. The NCG Charter expressly provided that the Nominating and Corporate Governance Committee was responsible "[t]o review and discuss with management disclosure of the Company's corporate governance practices," including disclosure regarding "the operations of the NCG Committee and other Board committees," "director independence," and "the director nominations process," and to recommend inclusion of such disclosure in the Company's proxy statements and annual reports.

53. The NCG Charter further required the Committee "[t]o renew, propose changes to the Board, or develop" the Company's "code of ethics, corporate governance guidelines, and other corporate governance policies."

54. The NCG Charter additionally required the Committee "[t]o oversee engagement with stockholders and proxy advisory firms" and to review shareholder proposals and related Board responses.

55. The NCG Charter further required the Committee to review "emerging corporate governance trends, best practices, and regulations applicable to the corporate governance of the Company."

56. During the Relevant Period, Defendants Forth, Sundberg, and Mills served on the Nominating and Corporate Governance Committee and were therefore responsible for overseeing the Company's governance framework and governance-related disclosures disseminated to Shoals shareholders through the Company's proxy statements and other public filings.

**The Insider Trading Policy**

57. At all relevant times, the Individual Defendants as officers and/or directors of Shoals, were bound by the Company's Insider Trading Policy (the "Insider Trading Policy"). In a section titled "Purpose," the Insider Trading Policy states:

18

This Insider Trading Policy (the "Policy") provides guidelines with respect to transactions in the securities of Shoals Technologies Group, Inc. (the "Company") and the handling of confidential information about the Company and the companies with which the Company does business. The Company's Board of Directors (the "Board") has adopted this Policy to promote compliance with federal, state, and foreign securities laws that prohibit certain persons who are aware of material nonpublic information about a company from: (i) trading in securities of that company; or (ii) providing material nonpublic information to other persons who may trade on the basis of that information.

58. In a section titled "Person Subject to the Policy," the Insider Trading Policy states:

This Policy applies to all directors, officers, and employees of the Company and its subsidiaries. The Company may also determine that other persons should be subject to this Policy, such as contractors or consultants who have access to material nonpublic information. This Policy also applies to family members, other members of a person's household and entities controlled by a person covered by this Policy, as described below under "Transactions by Family Members and Others" and "Transactions by Entities You Influence and Control."

59. In a section titled "Transactions Subject to the Policy," the Insider Trading Policy states:

This Policy applies to transactions in the Company's securities (collectively referred to in this Policy as "Company Securities"), including the Company's common stock, options to purchase common stock, or any other type of securities that the Company may issue, including (but not limited to) preferred stock, convertible debentures and warrants, as well as derivative securities that are not issued by the Company, such as exchange-traded put or call options or swaps relating to Company Securities. Transactions subject to this Policy include purchases, sales and bona fide gifts of Company Securities.

60. In a section titled "Individual Responsibility," the Insider Trading Policy states:

Persons subject to this Policy have ethical and legal obligations to maintain the confidentiality of information about the Company and to not engage in transactions in Company Securities while in possession of material nonpublic information. Each individual is responsible for making sure that he or she complies with this Policy, and that any family member, household member or entity whose transactions are subject to this Policy, as discussed below, also complies with this Policy. In all cases, the responsibility for determining whether an individual is in possession of material nonpublic information rests with that individual, and any action on the part of the Company, the Chief Executive Officer, Chief Financial Officer, or Chief Legal Officer or any other employee or director pursuant to this Policy (or otherwise) does not in any way constitute legal advice or insulate an individual from liability under applicable securities laws. You could be subject to severe legal

19

penalties and disciplinary action by the Company for any conduct prohibited by this Policy or applicable securities laws, as described below in more detail under the heading "Consequences of Violations."

61. In a section titled "Statement of Policy," the Insider Trading Policy states:

It is the policy of the Company that no director, officer, or other employee of the Company (or any other person designated by this Policy or by the Chief Executive Officer, Chief Financial Officer or Chief Legal Officer as subject to this Policy) who is aware of material nonpublic information relating to the Company may, directly, or indirectly through family members or other persons or entities:

1. Engage in transactions in Company Securities, except as otherwise specified in this Policy under the headings "Transactions Under Company Plans and Certain Other Transactions," and "Rule 10b5-1 Plans";

2. Recommend the purchase or sale of any Company Securities;

3. Disclose material nonpublic information to persons within the Company whose jobs do not require them to have that information, or outside of the Company to other persons, including, but not limited to, family, friends, business associates, investors, and expert consulting firms, unless any such disclosure is made in accordance with the Company's policies regarding the protection or authorized external disclosure of information regarding the Company; or

4. Assist anyone engaged in the above activities.

62. The Insider Trading Policy further states:

In addition, it is the policy of the Company that no director, officer, or other employee of the Company (or any other person designated as subject to this Policy) who, in the course of working for the Company, learns of material nonpublic information about a company with which the Company does business, including a customer or supplier of the Company, or that is involved in a potential transaction or business relationship with the Company, may trade in that company's securities until the information becomes public or is no longer material.

There are no exceptions to this Policy, except as specifically noted herein. Transactions that may be necessary or justifiable for independent reasons (such as the need to raise money for an emergency expenditure), or small transactions, are not excepted from this Policy. The securities laws do not recognize any mitigating circumstances, and, in any event, even the appearance of an improper transaction must be avoided to preserve the Company's reputation for adhering to the highest standards of conduct.

**SUBSTANTIVE ALLEGATIONS**

63.     On December 30, 2020, Shoals filed a registration statement (the "IPO Registration Statement") on Form S-1 with the U.S. Securities and Exchange Commission ("SEC") for its initial public offering (the "IPO"), which was declared effective on January 26, 2021. On January 28, 2021, Shoals filed with the SEC a prospectus on Form 424B4 for the IPO, which incorporated and formed part of the IPO Registration Statement. In the IPO, Shoals and a private equity owner of the Company collectively sold more than 88.5 million shares of Shoals Class A common stock, which included a full exercise of the underwriters' overallotment option, at $25 per share, for over $2.2 billion in gross offering proceeds.

64.     The IPO Registration Statement claimed that: (1) Shoals was "founded" to provide EBOS solutions that "improve reliability and safety" and that Shoals's products were "more reliable" than "any other" solar EBOS system that was commercially available; (2) the Company's combine-as-you-go wiring architecture had "greater reliability and lower maintenance costs" compared to rival products and stated that its "reliability advantages" had contributed to the adoption of its goods in the marketplace; and (3) the Company "prioritize[d]" developing products that improved the "reliability and safety" of renewable energy, which it stated to be one of the reasons for the Company's "[l]ongstanding reputation for differentiated products" within the industry.

**March 2021 4Q20 Press Release and Form 10-K**

65.     On March 15, 2021, Shoals issued a press release announcing its financial results for the fourth quarter and year ending on December 31, 2020 (the "4Q20 Press Release"). According to the 4Q20 Press Release, the Company's quarterly revenue rose from $38 million in the prior year period to $39 million, representing year-over-year growth. The 4Q20 Press Release further reported that the Company's quarterly gross profit had increased by 19% year-over-year to

21

$15 million from $12.5 million and that the Company generated $4.2 million in quarterly net income.

66. On March 16, 2021, Shoals filed an annual report on Form 10-K with the SEC for its fiscal year ended December 31, 2020, which contained the same financial information that was reported in the 4Q20 Press Release. The Form 10-K was signed by Whitaker, Garton, Forth, Jonna, Solon, and Wilver, among others.

**May 2021 1Q21 Press Release and Form 10-Q**

67. On May 3, 2021, Shoals issued a press release disclosing its financial results for the first quarter of fiscal year 2021 (the "1Q21 Press Release"). The 1Q21 Press Release indicated that Shoals's quarterly revenue had increased by 12% year-over-year, reaching a "record" $45.6 million, increased from $41 million in the prior year period. The 1Q21 Press Release further announced that the Company's gross margin in the quarter had expanded by 635 basis points year-over-year. According to the 1Q21 Press Release, gross margin rose 6.4%, from 34.8% in the prior year period to 41.2% and Shoals's gross profit had increased 32% year-over-year to $19 million, up from $14 million in the prior year period. Additionally, Shoals reported a quarterly net loss of $8.3 million.

68. On May 4, 2021, the Company filed with the SEC its Form 10-Q for the period ended March 31, 2021 (the "1Q21 10-Q"), which contained the same financial results as those reported in the 1Q21 Press Release. The 1Q21 10-Q was signed and its accuracy attested to by Whitaker and Garton.

**August 2021 2Q21 Press Release and Form 10-Q**

69. On August 10, 2021, Shoals issued a press release announcing its financial results for the second quarter of fiscal year 2021 (the "2Q21 Press Release"). The 2Q21 Press Release represented that Shoals's quarterly revenue had grown 38% year-over-year, rising from $43.4

22

million in the prior year period to $60 million. The 2Q21 Press Release further disclosed that the Company's gross profit for the quarter had increased by $9 million, a 56% year-over-year gain, from $17 million in the prior year period to $26 million. Further, the Company's quarterly net income rose from $5 million in the prior year period to $9 million.

70. In the 2Q21 Press Release, Whitaker touted the Company's combine-as-you-go solution and claimed the Company's product demand "continue[d] to … grow []."

71. On August 11, 2021, the Company filed with the SEC its Form 10-Q for the quarterly period ended June 30, 2021 (the "2Q21 10-Q"), which contained the same financial results as those reported in the 2Q21 Press Release. The 2Q21 10-Q was signed and its accuracy attested to by Whitaker and Garton.

**November 2021 3Q21 Press Release and Form 10-Q**

72. On November 9, 2021, Shoals issued a press release announcing its financial results for the third quarter of fiscal year 2021 (the "3Q21 Press Release"). The 3Q21 Press Release represented that the Company's quarterly revenue had increased 14% year-over-year, increasing from $53 million in the prior year period to $60 million. The 3Q21 Press Release went on to disclose that the Company's quarterly gross profit had increased by $1 million, a 5% gain, rising from $21 million in the prior year period to $22 million and that the Company also accomplished a quarterly net income of $5 million.

73. In the 3Q21 Press Release, Whitaker was quoted as saying the Company was expanding "faster than the market" and taking "share" from traditional EBOS providers.

74. On November 10, 2021, the Company filed with the SEC its Form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q contained the same financial results as those reported in the 3Q21 Press Release. The 3Q21 10-Q was signed and its accuracy attested to by Whitaker and Garton.

23

**March 2022 4Q21 Press Release**

75.     On March 10, 2022, Shoals issued a press release announcing the financial results for the fourth quarter of fiscal year 2021 (the "4Q21 Press Release"). The 4Q21 Press Release announced a 24% growth in Shoals's quarterly revenue year-over-year, increasing from $39 million in the prior year period to $48 million. The 4Q21 Press Release also represented that the Company's quarterly gross profit had increased by $1 million, a 7% gain year-over-year, rising from $15 million in the prior year period to $16 million and that the Company had experienced a quarterly net loss of $2.2 million.

**Fiscal Year 2021 Form 10-K**

76.     On March 11, 2022, the Company filed an annual report on Form 10-K with the SEC, for the fiscal quarter and full year ended December 31, 2021 (the "2021 10-K"), reiterating the financial results reported in the 4Q21 Press Release. The 2021 10-K was signed by Whitaker, Garton, Forth, Jonna, Daul, Sundberg, Volpe, and Wilver. Its accuracy was attested to by Whitaker and Garton.

**May 2022 Q122 Press Release, Conference Call, and Form 10-Q**

77.     On May 16, 2022, Shoals issued a press release announcing the financial results for the first quarter of fiscal year 2022 ended March 31, 2022 (the "1Q22 Press Release"). The 1Q22 Press Release disclosed a 49% increase in Shoals's quarterly revenue year-over-year, rising from $45.6 million in the prior year to a "record" $68 million. The 1Q22 Press Release further represented that the Company's quarterly gross profit had increased by $7 million, 40% year-over-year, rising from $19 million in the prior year period to $26 million, and that Shoals's gross margin in the quarter had increased more than 550 basis points to 38.7% on a sequential basis and that Shoals's quarterly net income increased year-over-year to $5 million from a net loss of $8 million.

78. Also on May 16, 2022, Shoals hosted a conference call with investors and analysts. While on the call, Whitaker stated, in relevant part:

> And also, when you look at the case – the use case in the international market, obviously, the higher the labor, the higher the value proposition. But the reality is, even outside of that, there's a lot of opportunities. We're seeing places that have very low – or relatively low labor rates that we're seeing success with as well. So there's more than just the labor aspect when you look at the quality and the reliability of our product offerings out there.

79. That same day, Shoals published its 1Q22 Investor Presentation on its website which stated that Shoals' "products…are…more reliable than competing solutions" and that the products' "greater reliability" is due to their "fewer connections and pre-terminated 'plug-n-play' connectors." The presentation stated that Shoals' factory "produce[s] products with superior quality, reliability, and safety" and that as a result, the products "can be installed by anyone." Shoals' plug-n-play connectors were described as "[s]imple push connectors [that] speed installation, reduce errors and make the system installable by general labor rather than requiring licensed electricians." The 1Q22 Investor Presentation emphasized that Shoals' combine-as-you-go system had "less potential for failure" because it "[i]ncreases safety and reliability" through "[p]re-terminated connectors" that were "[f]actory rather than field fabricated," resulting in "[f]ewer failure points."

80. On May 17, 2022, Shoals filed, with the SEC, its quarterly report on Form 10-Q for the first quarter of fiscal year 2022 (the "1Q22 10-Q"). The 1Q22 10-Q reiterated the financial disclosures from the 1Q22 Press Release. The 1Q22 10-Q further explained that "[w]hen we sell a system solution, we enter into a contract with our customers" that includes a "warranty for the products being purchased." The 1Q22 10-Q then falsely assured stockholders that the Company's reported "Cost of Revenue" included costs related to the "product warranty." The 1Q22 10-Q also provided generic and boilerplate warnings that any "defects or performance problems in our

25

products *could* result in loss of customers" and that the Company "*may* face warranty, indemnity and product liability claims arising from defective products." The 1Q22 10-Q was signed and its accuracy attested to by Whitaker and Hubbard.

**August 2022 2Q22 Press Release, Conference Call, and Form 10-Q**

81. On August 15, 2022, Shoals issued a press release announcing its financial results for the second quarter of fiscal year 2022, ended June 30, 2022 (the "2Q22 Press Release"). The 2Q22 Press Release reported a 23% year-over-year increase in Shoals's quarterly revenue, rising from $60 million in the prior year period to $73.5 million, disclosed that the Company's quarterly gross profit had increased by $3 million, or 9% year-over-year, rising from $26 million in the prior year period to $29 million, and revealed that the Company had earned $7.3 million in quarterly net income.

82. The 2Q22 Press Release further reiterated the "safety" and "reliability" of Shoals' products, representing that "[s]ince its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability." Further, therein, Whitaker attributed the demand for the Company's products, which purportedly "continue[d] to grow," to the Company's combine-as-you-go solution.

83. That same day, the Company hosted a conference call with investors and analysts. During the conference call, Whitaker stated, in relevant part:

> Re-fixing the performance, quality, reliability, installation savings and customer service that Shoals offers, they become open to trying our combine-as-you-go architecture and buy the BLA. Once customers make the transition, this usually marks the start of a long-term relationship.

84. Whitaker also highlighted the purported "value" of the Company's products in response to an analyst's question, underscoring their "quality" and "reliability" in particular. He

stated, in relevant part, that "BLA can reduce labor costs, improve safety, increase reliability and reduce maintenance expenses."

85. That same day, Shoals published its 2Q22 Investor Presentation on its website which substantially repeated the representations made in the 1Q22 Investor Presentation described above.

86. On August 16, 2022, the Company filed with the SEC its Form 10-Q for the quarterly period ended June 30, 2022 (the "2Q22 10-Q"), which reiterated the financial results reported in the 2Q22 Press Release. Additionally, the 2Q22 10-Q repeated all-encompassing and boilerplate warnings that any "defects or performance problems in our products *could* result in loss of customers" and that the Company "*may* face warranty, indemnity and product liability claims arising from defective products." The 2Q22 10-Q was signed and its accuracy attested to by Whitaker and Hubbard.

**November 2022 3Q22 Press Release, Conference Call, and Form 10-Q**

87. On November 14, 2022, Shoals issued a press release announcing its financial results for the third quarter of fiscal year 2022 ended September 30, 2022 (the "3Q22 Press Release"). The 3Q22 Press Release reported a 54% increase in Shoals's quarterly revenue year-over-year, rising from $60 million in the prior year period to $91 million. The 3Q22 Press Release went on to disclose that the Company's "record" quarterly gross profit had increased by $14 million, a 66% gain, increasing from $22 million in the prior year period to $36 million, purportedly due to a higher proportion of revenue earned from the Company's combine-as-you-go system, which the press release indicated carried "higher margins" relative to the Company's other products. According to the 3Q22 Press Release, Shoals's quarterly net income had also improved year-over-year to $13 million from $5 million in the prior year period.

27

88. The 3Q22 Press Release highlighted the purported "safety" and "reliability" of Shoals' products and further included a statement by Whitaker emphasizing that Shoals's products' "performance" allowed the Company to take advantage of favorable market trends:

At the same time as we are taking share and introducing new products, conditions in our core solar market are improving. The two-year tariff exemption for Chinese solar panels, the recently passed Inflation Reduction Act and higher energy prices have given our customers and end-users the confidence to reinitiate previously delayed projects, make multi-year commitments to invest in solar generation and prioritize product availability and performance over price . . .

89. Also on November 14, 2022, the Company hosted a conference call with investors and analysts. Throughout the call, Whitaker emphasized the supposed "value proposition" provided by the Company's combine-as-you-go system, which he assured investors and analysts allowed the Company to profit from favorable market conditions:

In addition, the prevailing wage provision of the IRA is expected to compound wage pressure in the U.S. market, which further reinforces the value proposition of our combine-as-you-go system. From day 1, we set out to create products that can be installed by anyone as a response to the disproportionately high cost of installing EBOS, which can be equal to or in excess of the cost of the product itself. In environments where labor is more expensive, our solutions are especially attractive as they take less time to install and are installable by general labor. We anticipate the prevailing wage provision will provide a significant tailwind for years to come.

90. That same day, Shoals published its 3Q22 Investor Presentation on its website which substantially repeated the representations made in the 1Q22 and 2Q22 Investor Presentations described above.

91. Also on November 14, 2022, the Company filed with the SEC its Form 10-Q for the quarterly period ended September 30, 2022 (the "3Q22 10-Q"), which reiterated the financial results reported in the 3Q22 Press Release. Additionally, the 3Q22 10-Q repeated the all-encompassing and boilerplate warnings that any "defects or performance problems in our products *could* result in loss of customers" and the Company "*may* face warranty, indemnity and product liability claims arising from defective products."

28

**Secondary Public Offering**

92.    On December 6, 2022, the Company conducted its secondary public offering (the "SPO"). Through the SPO, and through the underwriters' decision to exercise their option to purchase additional shares, the Company and Solon (along with entities he controlled as managing member) collectively sold 29.9 million shares of Shoals Class A common stock at $22.25 per share for nearly $665.3 million in gross offering proceeds, including a full exercise of the underwriters' overallotment option.

93.    The SPO was conducted pursuant to, and the sale of common stock was solicited by, the automatic shelf registration statement on Form S-3 the Company filed with the SEC on November 30, 2022, which the SEC declared effective the same day (the "Registration Statement"); a November 30, 2022 preliminary prospectus supplement; and a December 5, 2022 final prospectus supplement filed on Form 424B5 with the SEC, which incorporated and formed part of the Registration Statement (all together, the "Offering Materials"). The Registration Statement was signed by Bardos, Daul, Forth, Julian, Mills, Sundberg, Volpe, Whitaker, and Wilver.

94.    The Offering Materials represented that "[w]hen we sell a system solution, we enter into a contract with our customers" that included a "warranty for the products being purchased," and falsely assured investors that Shoals's reported "Cost of Revenue" incorporated costs related to the "product warranty." The Offering Materials also contained generic and boilerplate warnings that Shoals "*may* experience . . . quality control problems," that any "defects or performance problems in our products *could* result in loss of customers" and that Shoals "*may* face warranty, indemnity and product liability claims arising from defective products."

95.    Further, the SPO Registration Statement listed "converting customers" to the Company's combine-as-you-go system as a "core" component of the Company's growth strategy.

The SPO Registration Statement specifically stated that the Company was "in the process of transitioning" fourteen additional customers to the Company's combine-as-you-go approach, and that the Company was "currently prospecting" seventy-two other customers to make the same switch.

96. Additionally, the SPO Registration Statement represented that during the nine months ended September 30, 2022: (i) the Company's revenue had increased by almost 41% from $165 million in the prior year period to $232 million; (ii) Shoals's gross profit had increased 36% from $67 million in the prior year period to $91 million; and (iii) the Company's net income had increased by more than 300% from $6 million in the prior year period to $25 million.

**February 2023 4Q22 Press Release**

97. On February 28, 2023, Shoals issued a press release announcing the financial results for its fourth quarter and full fiscal year 2022 (the "4Q22 Press Release"). The 4Q22 Press Release reported a 97% increase in Shoals's quarterly revenue year-over-year, rising from $48 million in the prior year period to $95 million. The 4Q22 Press Release went on to disclose that the Company's quarterly gross profit had increased by $24.4 million, a 154% gain year-over-year, increasing from $16 million in the prior year period to $40.4 million and that Shoals's quarterly net income had increased to $118 million from $2 million in prior year period, indicating a year-over-year increase.

98. In the 4Q22 Press Release, Whitaker boasted that the Company was "commercially, operationally, and financially" the strongest "it ha[d] ever been," stating, in relevant part:

> The strength of demand for our products is underscored by the $428.6 million of backlog and awarded orders that we ended the year with, which represented growth of 43% compared to the same time last year. As a matter of fact, in just the first few weeks of the new year, backlog and awarded orders has hit record levels yet again, as we have continued to win new customers. I am incredibly proud of what Shoals has accomplished over the past several years and that I will leave the Company commercially, operationally and financially stronger than it has ever been.

30

99. The 4Q22 Press Release also touted the "safety" and "reliability" of Shoals' products.

100. That same day, Shoals published its 4Q22 Investor Presentation on its website which substantially repeated the representations made in the previous Investor Presentations described herein.

**Fiscal Year 2022 Form 10-K**

101. Also on February 28, 2023, Shoals filed with the SEC its Annual Report on Form 10-K for the fourth quarter and full fiscal year 2022 (the "2022 10-K"), which reiterated the financial results regarding the Company's revenue, gross profit, and net income reported in 4Q22 Press Release. It also reported that "as of December 31, 2022 and 2021 our estimated accrued warranty reserve was $0.6 million and $0.1 million, respectively." In addition, regarding product quality, the 22 10-K represented that the Company's "products meet our stringent quality requirements" and boasted of the Company's focus on "making quality foremost in all we do, make, and sell."

102. The 2022 10-K stated that Shoals "*may* face warranty, indemnity and product liability claims arising from defective products" but like previous representations, did not provide a clear and direct warning regarding its faulty wiring issues.

103. The 2022 10-K also represented that Shoals's use of "interconnect harnesses" and BLA in the combine-as-you-go wire architecture resulted in "greater reliability" and "lower maintenance costs" in comparison to traditional "homerun" systems, stating, in relevant part:

> Connection points are often the source of failure in EBOS systems and must be inspected regularly. A solar energy project that uses our interconnect harness and BLA will have significantly fewer connections and, as a result, fewer failure points to inspect and maintain than the same project would using a conventional homerun system. We believe fewer potential failure points contributes to higher reliability and lower maintenance costs for solar energy projects that use our combine-as-you-go system when compared to a conventional homerun system.

31

104. The 2022 10-K was signed by Bardos, Daul, Forth, Julian, Mills, Sundberg, Volpe, Whitaker, and Wilver.

**May 2023 1Q23 Press Release, Conference Call, and Form 10-Q**

105. On May 8, 2023, Shoals issued a press release announcing its financial results for the first quarterly period of fiscal year 2023 ended March 31, 2023 (the "1Q23" Press Release). The 1Q23 Press Release reported a 55% increase in Shoals's revenue year-over-year, rising from $68 million in the previous period to $105 million. The 1Q23 Press Release went on to disclose that the Company's gross profit for the quarter had increased by $22 million, an 84% gain year-over-year, increasing from $26 million in the prior year period to $48 million and that Shoals's quarterly net income increased 265% year-over-year, rising from $4.6 million in the prior year period to $17 million.

106. Tolnar was also quoted in the 1Q23 Press Release touting the Company's "exceptional first quarter" and "record revenue and earnings" and represented that the Company experienced "continued robust demand" for its products.

107. Also on May 8, 2023, the Company hosted a conference call with investors and analysts. During the call, Tolnar announced that Shoals "set a new record[] for revenue" in the quarter that was driven by "increased demand for Solar EBOS generally and [Shoals's] combine-as-you-go system solutions specifically." Tolnar further represented that Shoals experienced an "acceleration" in quoting activity from prospective clients that broke "new records" in the quarter. He then assured investors and analysts that demand for the Company's products "remained very strong." Tolnar also represented that the Company had "invested millions of dollars" over the "last 27 years" to develop its EBOS solutions that "significantly increased installation efficiency and safety" and "improv[ed] system performance and reliability for the utility scale solar" market, among others.

32

108. Also on May 8, 2023, the Company filed with the SEC its Form 10-Q for the quarterly period ended March 31, 2023 (the "1Q23 10-Q"). The 1Q23 10-Q was signed and its accuracy attested to by Tolnar and Bardos. The 1Q23 10-Q reiterated the financial results that were reported in the 1Q23 Press Release. Additionally, the 1Q23 10-Q represented that the Company's provision for accrued warranty liability was $400,000 as of March 31, 2023. Regarding "contingencies" facing the Company, the 1Q23 10-Q stated for the first time that:

> The Company has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting excessive pull back of wire insulation a connection points ("shrinkback"). Based upon the Company's initial assessment the Company believes the shrinkback is related to a subset of specific colored wire provided by one specific supplier. While it is probable that the Company will incur costs related to the repair or replacement of the impacted wire harnesses, based on the limited information available as of the date of this Quarterly Report, including the scope of affected sites, potential solutions and the possibility of recovery from the wire supplier, it is not possible to reasonably estimate those costs. The Company is continuing its investigation of this matter to determine a course of action, and has substantially ceased use of the related wire from this supplier.

109. That same day, Shoals published its 1Q23 Investor Presentation on its website which substantially repeated the representations made in the previous Investor Presentations described herein.

**August 2023 2Q23 Press Release, Conference Call, and Form 10-Q**

110. On August 1, 2023, Shoals issued a press release announcing the financial results for the second quarter of fiscal year 2023 (the "2Q23 Press Release"). The 2Q23 Press Release and the corresponding earnings call unexpectedly revealed that the Company was recording a $9.4 million warranty charge largely due to the previously disclosed shrinkback insulation issue. Consequently, the 2Q23 Press Release reported that the Company's gross profit margin for the quarter had declined from approximately 46% reported in the previous quarter to 42.4%. Although the Company had incurred this expense, it continued to acknowledge quality control problems as only *potential* risks that *could* occur in the future, stating that "we *may* experience delays,

33

disruptions or quality control problems in our manufacturing operations." The 2Q23 10-Q included boilerplate warning provisions, such as:

> Any actual or perceived errors, defects or poor performance in our products could result in the replacement or recall of our products, shipment delays, rejection of our products, damage to our reputation, lost revenue, diversion of our engineering personnel from our product development efforts and increases in customer service and support costs, all of which could have a material adverse effect on our business, financial condition and results of operations. . . . defective components may give rise to warranty, indemnity or product liability claims against us.

111.    The 2Q23 Press Release also reported a 62% year-over-year increase in Shoals's revenue for the quarter, rising from $73.5 million in the previous period to $119 million and further represented that the Company's gross profit for the quarter had increased 77% year-over-year, increasing from $28.6 million in the prior year period to $50.5 million. Further, according to the 2Q23 Press Release, Shoals's quarterly net income had increased 159% year-over-year, rising from $7.3 million in the prior year period to $19 million. Tolnar was quoted in the 2Q23 Press Release as emphasizing the Company's purported "outstanding performance" and "records for revenue and earnings," and further reporting that the Company experienced "robust" demand for its products, which "remained strong."

112.    On August 1, 2023, the Company hosted a conference call with investors and analysts. Throughout the call, Tolnar touted that "increased demand for solar EBOS generally and [Shoals's] combine-as-you-go System Solutions specifically" was the reason behind the Company's "record" financial performance in the quarter. Tolnar assured investors that demand for the Company's products "remains very strong" and that the Company's system solutions saw "continued share gains." Tolnar attributed the Company's "new record[] for revenue" in the quarter to "increased demand for Solar EBOS generally and [Shoals'] combine-as-you-go system solutions specifically." Tolnar went on to state that Shoals experienced an "acceleration" in quoting activity from prospective clients that broke "new records" in the quarter.

34

113. While on the conference call, an Oppenheimer & Co. Inc. analyst asked for further information regarding the extent of the warranty expense issue and specifically "[h]ow extensive it was in terms of the number of customers and number of shipments and how much time it was spread over?" Bardos replied, stating that the warranty expense was "limited to one of [Shoals'] suppliers" and that "the charge that we booked in the quarter, we believe, is adequate to do the remediation required, that's why we booked it." Additionally, Bardos stated, "[w]e've communicated pretty much everything we can[.]"

114. That same day, Shoals published its 2Q23 Investor Presentation on its website which substantially repeated the representations made in the previous Investor Presentations described herein.

115. On August 1, 2023, the Company filed with the SEC its Form 10-Q for the quarterly period ended June 30, 2023 (the "2Q23 10-Q"). The 2Q23 10-Q was signed and its accuracy attested to by Moss and Bardos. The 2Q23 10-Q reiterated the financial results that were reported in the 2Q23 Press Release, including that, as of June 30, 2023, Shoals had incurred a $9.4 million charge for accrued warranty expense to address the shrinkback insulation issue.

116. On this news, the price of the Company's Class A common stock dropped from $26.11 per share on August 1, 2023 to $24.51 per share on August 2, 2023, or about 6%. However, the price of Shoals' common stock continued to be artificially inflated as a result of material misstatements and omissions concealing the full truth about the Company's business, operations, and prospects.

**November 2023 3Q23 Press Release, Conference Call, and Form 10-Q**

117. On November 7, 2023, Shoals issued a press release announcing the financial results for the third quarter of fiscal year 2023 (the "3Q23 Press Release"). Bardos's prior assurances that the previous $9.4 million warranty charge incurred was sufficient to pay the

35

shrinkback remediation costs were quickly shown to be wrong. The 3Q23 Press Release revealed the true extent to which the wire issue had affected the Company, revealing a five-fold increase in the warranty expense during the quarter, now amounting to $50.2 million. Additionally, the Company disclosed that the shrinkback insulation issue impacted 30% of the Company's wire harnesses installed between 2020 and 2022. The range of potential loss related to the shrinkback issue was between $59.7 million and $184.9 million.

*118.* The 3Q23 Press Release disclosed that the Company's gross profit for the quarter had decreased more than 60%, dropping from $36 million in the prior year quarter to $14 million. The 3Q23 Press Release further indicated that Shoals had suffered a net loss of $10 million in the third quarter compared to net income of $13 million in the prior year period. While on the accompanying conference call, Moss further disclosed the total potential expenses associated with site remediation, admitting that the potential for loss ranged from $60 million to $185 million.

119. The 3Q23 Press Release also indicated a 48% year-over-year increase in Shoals's revenue for the quarter, which rose from $91 million in the previous period to $134 million. Additionally, Moss emphasized the Company's "record" backlog and awarded orders and represented that Shoals's supposedly "strong value proposition" would continue to "drive order growth," stating, in relevant part:

> Backlog and awarded orders increased 34% year-over-year and 16% sequentially to a Company record of $633.3 million as the Company added over $220 million in orders in the quarter. While the domestic utility scale solar market is currently experiencing slower growth, we believe our strong value proposition and the emerging strength from our international business will continue to drive order growth. We are pleased that international now represents more than 10% of our backlog and awarded orders.

120. Also on November 7, 2023, the Company hosted a conference call with investors. Despite the revelations of the 3Q23 Press Release, Moss touted the Company's supposedly

36

"industry-leading margins" and "significant cash flow generation" and claimed that he could "not be more excited" and "optimistic" about what could be accomplished in the future quarters.

121. During the conference call, a Morgan Stanley analyst asked whether the shrinkback issues had led to customers' projects being "tripped offline." In response, Moss stated that Shoals had not noticed any impacts and that customers were "appreciative" of how the Company was handling the issue. Specifically, Moss stated, in relevant part:

> Just to add to that, as Meghan said, we're proactively reaching out to our customers. We have not seen any project movement specific to the warranty issue. I think the customers understand that this is a supplier issue. And as Meghan said, taking care of them is our top priority. So I think everybody is appreciative of how we're communicating and working in the marketplace around this issue.

122. That same day, Shoals publish a 3Q23 Investor Presentation on its website, which provided a "Warranty Liability Update," stating that "it is believed that approximately 300 sites may have harnesses made with this wire, representing about 30% of the total amount of Shoals' harnesses manufactured during the same timeframe." The update further stated that at the end of 3Q23, the Company "has recorded a warranty liability of $56.6 [million] and determined that the high end of the range is $184.9 [million]."

123. On November 7, 2023, the Company also filed with the SEC its Form 10-Q for the period ended September 30, 2023 (the "3Q23 10-Q"), reiterating the financial results that were reported in the 3Q23 Press Release, including a disclosure regarding the BLA defect and stating that Shoals' provision for accrued warranty expense related to the BLA defect was $56.6 million as of September 30, 2023. The 3Q23 10-Q was signed by Moss and Bardos and its accuracy attested to by Whitaker and Hubbard.

124. On this news, the price of the Company's Class A common stock dropped from $16.23 per share on November 7, 2023 to $12.95 per share on November 9, 2023. This represented a decline of $3.28 per share, or approximately 20%, within a two-day trading period, wiping out

37

approximately $550 million in market capitalization. Again, however, the price of Shoals' common stock continued to be artificially inflated as a result of material misstatements and omissions concealing the full truth about the Company's business, operations, and prospects.

**February 2024 4Q23 Press Release and 10-K**

125. On February 28, 2024, Shoals issued a press release announcing the financial results for its fourth quarter and year ended fiscal year 2023 (the "4Q23 Press Release"). The 4Q23 Press Release disclosed that growth in the Company's backlog and awarded orders had materially declined by $2 million to $631.2 million from $633.3 million in the previous quarter, indicating a significant deterioration in growth. Additionally, the 4Q23 Press Release provided a disappointing financial outlook for Shoals's first fiscal quarter and full year 2024. Specifically, the 4Q23 Press Release provided quarterly revenue guidance of $90 million to $100 million, indicating that the revenue for the quarter was expected to decline sequentially by more than $35 million at the midpoint of the range and provided 2024 annual revenue guidance for the Company of $480 to $520 million, which at the midpoint was roughly 19% less than the consensus analyst estimates of $620 million.

126. That same day, Shoals published a 4Q23 Investor Presentation, disclosing that "[i]nitially, shrinkback issues were found on at least 20 sites of the approximately 300 sites that may have had the defective [] wire" but that Shoals had been "informed that approximately 10 incremental sites [had] experienced shrinkback."

127. Also on February 28, 2024, Shoals filed with the SEC an annual report on Form 10-K for the fiscal year ended December 31, 2023 (the "2023 10-K"). The 2023 10-K included a disclosure regarding the BLA defect and stated that Shoals' provision for accrued warranty expense related to the BLA defect was $54.9 million as of December 31, 2023. The 2023 10-K was signed by Moss, Bardos, Forth, Daul, Sundberg, Volpe, Wilver, Mills, and Julian.

38

128. On this news, the Company's stock price dropped from $15.39 per share on February 28, 2024 to $12.83 per share on February 29, 2024. This represented a decline of more than 16% on above-average trading volume of over 15 million shares traded.

**May 2024 1Q24 Press Release and Form 10-Q**

129. On May 7, 2024, Shoals issued a press release announcing the Company's financial results for the first fiscal quarter ended March 31, 2024 ("1Q24 Press Release"). The 1Q24 Press Release disclosed the true severity of the Company's shrinkback issue, revealing that it had led to business deterioration that was much more significant than previously indicated. Specifically, the 1Q24 Press Release stated that the Company's backlog and awarded orders had dropped more than $16 million on a sequential basis to $615.2 million. Additionally, the financial guidance provided in the 1Q24 Press Release decreased the Company's 2024 annual revenue guidance by 7% at the midpoint to a range of $440 million to $490 million. While on the corresponding earnings call, Company executives admitted that Shoals had suffered an "unprecedented" project cancellation and multiple order delays during the quarter.

130. That same day, Shoals filed with the SEC its Form 10-Q for the period ended March 31, 2024, which warned that Shoals's estimate for shrinkback remediation and warranty costs "may increase" and that this increase "may be material." The Form 10-Q was signed by Moss.

131. On this news, the price of the Company's Class A common stock dropped from $8.80 per share on May 7, 2024, to $7.51 per share on May 8, 2024, or about 15%, on above average trading volume.

**November 2024 3Q24 Press Release**

132. On November 12, 2024, Shoals filed with the SEC its Form 10-Q for the third quarter of 2024, announcing that it had increased the lower end of its estimated loss due to warranty

liability by $13.3 million. Further, Shoals reported that the Company's backlog and orders were down 5.8% from the same quarter the year prior.

133. On this news, the price of the Company's Class A common stock dropped from $5.77 on November 11, 2024 to $4.85 per share on November 12, 2024, or approximately 16%.

134. The statements contained herein were materially false and misleading statements regarding Shoal's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, inter alia, that: (1) the Company's installment of faulty wires at nearly 300 sites between 2020 and 2022 impacted nearly 30% of all wire harnesses Shoals manufactured during this time period; (2) consequently, the Company faced shrinkback warranty liabilities worth millions of dollars; (3) the Company did not book a sufficient warranty expense provision to cover the remediation costs for the shrinkback issue; (4) a significant portion of Shoals's historical reported revenue, gross profit, and net income had come from the sale of defective products that posed a risk of harm, death, and fire damage to the Company's customers; (5) the Company's ability to competitively differentiate its products through representations regarding their reliability, safety, and quality had become materially impaired; (6) several of the Company's customers had expressed concerns related to Shoals's defective wiring given the attendant risks of serious injury or death, fires, property damage, and increased governmental scrutiny; and (7) as a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

**False and Misleading Proxy Statements**

135. In addition to the false and misleading statements and omissions discussed above, the Individual Defendants also cause the Company to issue false and misleading proxy statements in 2022, 2023, and 2024 (the "Proxies"). The Proxies, among other things, recommended the re-

election of certain Individual Defendants, made representations regarding the Board's role in risk oversight at the Company, and included statements on the Company's Code of Ethics.

136.    These false and misleading proxy statements harmed Shoals by (1) interfering with the proper governance on its behalf that follows the free and informed exercise of shareholders' right to vote for directors; (2) falsely assuring shareholders that the Board was, among other things, actively monitoring the Company's risks and compliance with applicable laws and regulations and maintaining its oversight duties and internal controls; and (3) failing to disclose the Individual Defendants' violations of the Code of Ethics and other corporate documents as well as state and federal laws.

### While in Possession of Material Non-Public Information, Defendants Garton, Solon, and Whitaker Sold Over $1.2 Billion Worth of Shoals Stock

137.    Prior to the truth being revealed to the market, Defendants Garton, Solon, and Whitaker misappropriated corporate information for their substantial benefit by collectively selling over $1.2 billion worth of Shoals stock at artificially inflated prices.

138.    While Defendant Garton was serving as CFO, he possessed a sophisticated understanding of the Company's business operations and further possessed material nonpublic information which he knew was being concealed from investors. Defendant Garton consciously acted to exploit his knowledge by selling nearly $5 million in Shoals stock for his substantial benefit, as set forth below:

| Date | Number of Shares | Average Price | Gross Proceeds |
|---|---|---|---|
| 12/17/2021 | 31,279 | $25.62 | $801,367.98 |
| 12/17/2021 | 67,821 | $26.34 | $1,786,405.14 |
| 2/1/2022 | 5,598 | $17.23 | $96,453.54 |
| 3/23/2022 | 100,000 | $22.00 | $2,200,000.00 |
| **Total** | **204,698** | | **$4,884,226.66** |

41

139. Defendant Solon, as director, former CEO, and founder of the Company, possessed a sophisticated understanding of the Company's business operations and further possessed material nonpublic information which he knew was being concealed from investors. Defendant Solon consciously acted to exploit his knowledge by selling nearly $1.2 billion in Shoals stock for his substantial benefit, as set forth below:

| Date | Number of Shares | Average Price | Gross Proceeds |
|---|---|---|---|
| 12/6/2021 | 564,668 | $21.47 | $12,123,422 |
| 12/6/2021 | 27,335,332 | $21.47 | $586,889,578 |
| 3/10/2022 | 24,501,650 | $24.25 | $594,165,012 |
| **Total** | **52,401,650** | | **$1,193,178,012** |

140. Defendant Whitaker, as the Company's CEO during the relevant period, possessed a sophisticated understanding of the Company's business operations and further possessed material nonpublic information which he knew was being concealed from investors. Defendant Whitaker consciously acted to exploit his knowledge by selling over $14 million in Shoals stock for his substantial benefit, as set forth below:

| Date | Number of Shares | Average Price | Gross Proceeds |
|---|---|---|---|
| 8/18/2022 | 125,003 | $26.84 | $3,355,080.52 |
| 8/19/2022 | 8,333 | $26.05 | $217,074.65 |
| 9/13/2022 | 8,333 | $25.21 | $210,074.93 |
| 9/14/2022 | 20,514 | $24.94 | $511,619.60 |
| 11/17/2022 | 11,257 | $27.67 | $311,481.19 |
| 11/17/2022 | 13,742 | $28.20 | $387,524.40 |
| 11/17/2022 | 40,676 | $31.10 | $1,265,023.60 |
| 11/18/2022 | 26,052 | $31.13 | $810,998.76 |
| 12/13/2022 | 13,020 | $25.37 | $330,317.40 |
| 12/14/2022 | 8,333 | $26.50 | $220,824.50 |
| 1/17/2023 | 12,054 | $28.58 | $344,503.32 |
| 1/18/2023 | 12,032 | $28.81 | $346,641.92 |
| 1/24/2023 | 12,032 | $28.66 | $344,837.12 |
| 1/25/2023 | 5,532 | $27.43 | $151,742.76 |
| 1/25/2023 | 6,500 | $28.26 | $183,690.00 |
| 2/1/2023 | 10,831 | $27.61 | $299,043.91 |
| 2/1/2023 | 1,201 | $28.19 | $33,856.19 |

| | | | |
|---|---|---|---|
| 2/2/2023 | 12,032 | $28.28 | $340,264.96 |
| 2/10/2023 | 3,008 | $23.87 | $71,800.96 |
| 2/10/2023 | 3,001 | $25.00 | $75,025.00 |
| 2/13/2023 | 12,039 | $25.07 | $301,817.73 |
| 3/2/2023 | 3,008 | $24.59 | $73,966.72 |
| 3/3/2023 | 15,040 | $25.08 | $377,203.20 |
| 3/14/2023 | 181,541 | $21.26 | $3,859,561.66 |
| **Total** | **565,114** | | **$14,423,975** |

141. Defendants Garton, Solon, and Whitaker thus used their fiduciary positions to enrich themselves and failed to discharge their duties by causing the Company to candidly reveal the truth concerning the reliability, safety, and quality of the Company's products.

## DAMAGES TO SHOALS

142. As a direct and proximate result of the Individual Defendants' actions including mismanagement, failure to oversee critical operational risks, failing to ensure that Shoals, and its directors and officers, complied with state and federal laws, as well as its own policies, dissemination of false and misleading information, and possible insider trading by at least Garton, Solon, and Whitaker, Shoals has suffered, and continues to suffer, severe financial, legal, and reputational harm.

143. The Company has and will incur substantial legal and professional expenses, including: (a) costs to defend, settle, or satisfy any adverse judgment in the *In re Shoals Technologies Group, Inc. Securities Litigation*, Case No. 3:24-cv-00334-WDC-AN (M.D. Tenn.) Securities Class Action and any related derivative proceedings; (b) fees paid to outside counsel, accountants and consultants in relation to litigation and internal investigations; and (c) costs related to investigating and implementing measures to address failures in corporate governance and risk management.

144. Further, Shoals has compensated and continues to compensate the Individual Defendants with substantial salaries, bonuses, stock options, and other benefits during the very

43

period when they were misleading investors and exposing the Company to enormous liability. These compensation packages constitute a waste of corporate assets and unjust enrichment and underscore the lack of appropriate accountability mechanisms at the Company.

145. Finally, the Company has clearly sustained reputational damage that will endure and currently its shares trade at a well-deserved "liar's discount" in the market. Such erosion of trust will also hinder Shoal's ability to attract capital, maintain partnerships, and retain key personnel—all critical to its future success.

146. In sum, the Individual Defendants' misconduct has inflicted substantial and lasting damage on the Company's financial health, strategic prospects, and reputation in the market. Absent meaningful corrective action including full restitution, clawback of improper compensation, internal reforms, and accountability for potential insider trading, these harms will persist and deepen over time.

## DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS

147. Plaintiff brings this action derivatively in the right of and for the benefit of Shoals to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, violations of federal law, waste of corporate assets, and other wrongful conduct as alleged herein.

148. Shoals is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

149. Plaintiff is an owner of Shoals stock and has been a continuous shareholder of Company stock at all relevant times.

44

150.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

151.    The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein.

152.    The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

153.    On March 18, 2026, Plaintiff, through Plaintiff's counsel, sent a demand (the "Demand") on Shoals' Board to investigate the violations of law described herein and to pursue remedies through litigation against the Individual Defendants for breaching their fiduciary duties by permitting Shoals to issue the improper statements set forth herein. The Demand outlined the same alleged misstatements made during the Relevant Period that are detailed herein. The Demand is attached hereto as Exhibit A.

154.    On March 25, 2026, Plaintiff received a letter on behalf of the Board (the "March 25, 2026 Letter") which acknowledged receipt of the Demand and stated that the Board would consider the Demand and "respond in due course." The March 25, 2026 Letter is attached hereto as Exhibit B.

155.    On May 15, 2026, counsel for Shoals sent the Demand Refusal Letter to Plaintiff's counsel purporting to respond on behalf of the Board. The Demand Refusal Letter stated that the Board had convened at its regularly scheduled meeting on April 30, 2026 and "discussed the

45

Demand," but stated that the Board had "determined to defer a final decision on the Demand at this time." The Demand Refusal Letter is attached hereto as Exhibit C.

156. The Board's deferral was not based on an investigation into the merits of Plaintiff's Demand. The Demand Refusal Letter does not contain a written report in connection with the Board's decision to refuse the Demand. In failing to produce a report, the company neglected to keep a proper record of its evaluation to allow Plaintiff and the Court to assess the reasonableness of its methodology in deciding to refuse the Demand. That the Company failed to issue any report is an incurable mistake to the refusal of the Demand because there is no adequate record of the investigation and no evidentiary record upon which to determine whether the Board in good faith refused the Demand.

157. Moreover, the Board, in the Demand Refusal Letter, declined "to cause the Company to enter into any tolling agreements at this time." That refusal is inconsistent with a good-faith deferral. If the Board truly intended to preserve its ability to investigate and later pursue claims on Shoals' behalf, it would have taken basic steps to protect the Company's claims from limitations defenses while its investigation remained pending. By refusing to toll claims against the Individual Defendants while simultaneously refusing to act on the Demand, the Board placed the Individual Defendants' litigation interests ahead of the Company's interest in preserving potentially valuable claims.

158. At the time the Board refused the Demand, the Board consisted of the following individuals: Defendants Forth, Moss, Daul, Julian, Mills, Sundberg, and Volpe, as well as non-party director Renu Ramdev.

159. The Board's decision-making to date is therefore not consistent with its obligation to determine in good faith whether the Demand's claims have merit and whether it would be in the

46

Company's best interest to pursue them. Given this lack of good faith, the Board's deferral of consideration of the Demand constitutes a constructive refusal of the Demand.

160.     The Board did not act independently, nor reasonably, nor in good faith, on the basis of all reasonably available information by plainly disregarding the merits of the claims and allegations in the Demand.

161.     For the foregoing reasons, the Board's refusal of the Demand falls outside of the protections of the business judgment rule. Plaintiff is therefore permitted to proceed and to prosecute this action derivatively on behalf of Shoals.

**CLAIMS FOR RELIEF**

**COUNT ONE**

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9)**

162.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

163.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that: "[i]t shall be unlawful for any person, by use of the mails or by any  means or instrumentality of interstate commerce or of nay facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 781]."

164.     Rule 14a-9, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with

47

respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

165. The Individual Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

166. In addition to the false and misleading statements and omissions discussed above, the Individual Defendants also cause the Company to issue false and misleading proxy statements in 2022, 2023, and 2024 (the "Proxies"). The Proxies, among other things, recommended the re-election of certain Individual Defendants, made representations regarding the Board's role in risk oversight at the Company, and included statements on the Company's Code of Ethics.

167. These false and misleading proxy statements harmed Shoals by (1) interfering with the proper governance on its behalf that follows the free and informed exercise of shareholders' right to vote for directors; (2) falsely assuring shareholders that the Board was, among other things, actively monitoring the Company's risks and compliance with applicable laws and regulations and maintaining its oversight duties and internal controls; and (3) failing to disclose the Individual Defendants' violations of the Code of Ethics and other corporate documents as well as state and federal laws. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

168. The misrepresentations and omissions in the Proxy Statements were material to Shoals stockholders, specifically in voting on matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, the reelection of certain Director Defendants.

169. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions.

170. Plaintiff, on behalf of Shoals, has no adequate remedy at law.

**Against the Individual Defendants for Breach of Fiduciary Duties**

171. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

172. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Shoals' business and affairs.

173. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

174. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Shoals.

175. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

176. In further breach of their fiduciary duties owed to Shoals, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company's installment of faulty wires at nearly 300 sites between 2020 and 2022 impacted nearly 30% of all wire harnesses Shoals manufactured during this time period; (2) consequently, the Company faced shrinkback warranty liabilities worth millions of dollars; (3) the Company did not book a sufficient warranty expense provision to cover the remediation costs for the shrinkback issue; (4) a significant portion of Shoals's historical reported revenue, gross profit, and net income had come from the sale of defective products that posed a risk of harm, death, and fire damage to the Company's customers; (5) the Company's ability to competitively differentiate its products through representations

49

regarding their reliability, safety, and quality had become materially impaired; (6) several of the Company's customers had expressed concerns related to Shoals's defective wiring given the attendant risks of serious injury or death, fires, property damage, and increased governmental scrutiny; and (7) as a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

177. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

178. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

179. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal

50

controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

180. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

181. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Shoals has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

182. Plaintiff on behalf of Shoals has no adequate remedy at law.

## COUNT THREE

### Against Defendants Garton, Solon, and Whitaker for Breach of Fiduciary Duty (*Brophy*)

183. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184. By reason of their fiduciary roles as officers, directors, and/or controlling persons of Shoals, Defendants Garton, Solon, and Whitaker (the "Insider Selling Defendants") specifically owed Shoals the highest obligation of due care, good faith, and loyalty.

185. As officers, directors, and/or controlling persons of the Company, the Insider Selling Defendants were given access, directly or indirectly, to material information about the Company, as described above, which was not generally available to the public.

186. When the Insider Selling Defendants sold their Company stock, as detailed supra, they were in possession of material, non-public information, and sold Company stock on the basis of such information; information which they each knew had a significant effect on the market price of the Company's stock.

51

187. The information described above was proprietary, non-public information concerning the Company's business operations and financial condition. It was a proprietary asset belonging to Shoals, which the Insider Selling Defendants misappropriated to their own benefit when they sold holdings in Company stock. The Insider Selling Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Company stock. As the use of Shoals' proprietary information for their own personal gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, Shoals is entitled to disgorge any illegal profits obtained thereby.

**COUNT FOUR**

**Against the Individual Defendants for Unjust Enrichment**

188. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

189. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Shoals.

190. The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Shoals that was tied to the performance or artificially-inflated valuation of Shoals or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

191. Plaintiff, as a shareholder and a representative of Shoals, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-

52

based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

192. Plaintiff on behalf of Shoals has no adequate remedy at law.

## COUNT FIVE

### Against the Individual Defendants for Waste of Corporate Assets

193. Plaintiff incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

194. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

195. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (1) paying excessive compensation, bonuses, and termination payments to certain of its executive officers, as detailed, supra; (2) awarding self-interested stock options to certain officers and directors; and (3) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Actions, addressing the Individual Defendants' unlawful action.

196. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

197. Plaintiff, on behalf of Shoals, has no adequate remedy at law.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Shoals and that Plaintiff is a proper and adequate representative of the Company;

B. Awarding the amount of damages sustained by the Company as a result of the

53

Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.      Directing Shoals to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Shoals and its stockholders from a repeat of the damaging events described herein, including, but not limited to strengthening the Company's internal reporting and financial disclosure controls;

D.      Awarding punitive damages;

E.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 22, 2026                                **GILREATH & ASSOCIATES, PLLC**

*/s/___Sidney Gilreath_____*
Sidney W. Gilreath
550 Main Ave., Ste 600
Knoxville, TN 37902
Telephone: 865-637-2442
Email: gilknox@sidgilreath.com

*Local Counsel for Plaintiff Joseph Cecil*

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: philkim@rosenlegal.com

*Counsel for Plaintiff Joseph Cecil*

54